UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CRAIG AHRENS, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 3:09-cv-186 (VLB) |
| DUNKIN' BRANDS, INC., | : | |
| Defendants. | : | January 4, 2011 |

MEMORANDUM OF DECISION DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [Doc. #29]

The plaintiff, Crag Ahrens (hereinafter "Ahrens"), brought this action for

damages against his former employer, Dunkin' Brands, Inc. (hereinafter

"Dunkin'").  Ahrens alleges that Dunkin' violated the Connecticut Fair Employment

Practices Act ("CFEPA"), Conn. Gen. Stat. 46a-58 et seq., and the Family and

Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, by terminating his employment

because of his depression.  Dunkin' has filed four counterclaims for breach of

contract, breach of the implied covenant of good faith and fair dealing, unjust

enrichment, and specific performance, alleging that the parties had a written

agreement obligating Ahrens to deliver to it a release of claims upon his

acceptance of a contractual severance payment of $97,500.

The case was originally filed in Connecticut Superior Court, but was

subsequently removed to this Court by Dunkin' on the basis of federal question

jurisdiction pursuant to 28 U.S.C. § 1331, and diversity jurisdiction pursuant to 28

U.S.C. § 1332, as Ahrens and Dunkin' are citizens of different states for diversity

purposes.

Presently pending before the Court is Dunkin's motion for summary judgment as to its four counterclaims only.  [Doc. #29].  Neither party has moved for summary judgment with respect to Ahrens' CFEPA and FMLA claims.  For the reasons that follow, Dunkin's motion is DENIED.

## I.  <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

The following facts relevant to Dunkin's motion for summary judgment are undisputed unless otherwise noted.  Ahrens was employed by Dunkin' as Vice President of Operations Services from on or about September 27, 2005 through on or about April 18, 2007.  Dunkin' extended Ahrens an offer to join the company through a written offer of employment (the "Offer") dated August 23, 2005, and signed by Dunkin's Vice President of Human Resources.  Haney Aff., Exh. B.  The Offer memorialized the terms of Ahrens' employment, including his annual salary of $195,000; sign-on bonus of $75,000; eligibility for periodic bonus payments through three incentive plans; a $533 bi-weekly allowance; and various medical and retirement benefits.  <u>Id.</u>  The Offer also set forth the means by which Ahrens would receive severance should Dunkin' terminate his employment for reasons other than for "cause."  <u>Id.</u>  In such a situation, the Offer provided that Ahrens would receive "severance equal to 6 months of [his] then-current base compensation, conditioned on the return of a full release of claims."  <u>Id.</u>  The Offer further stated that "[w]ithout our receipt of the full release of claims, you will not be entitled to the afore-mentioned severance."  <u>Id.</u>

2

Ahrens acknowledged and accepted the Offer on September 7, 2005. Ahrens admits that, prior to executing the Offer, he read and understood its terms, did not ask that any changes be made to the Offer, and accepted the position of Vice President of Operations Services as governed by the terms and conditions set forth in the Offer.  Pl. Loc. R. 56(a)(2) Statement ¶ 8.

Ahrens began his career with Dunkin' on or about September 27, 2005.  He continued to work for Dunkin' until on or about January 18, 2007, at which time he was diagnosed with depression and requested, and received, medical leave under the FMLA.  Ahrens was absent from work on FMLA leave until on or about April 1, 2007, when he was released to work without any medical restriction.  Dunkin' asked Ahrens to wait until on or about April 10, 2007 to return to work.

On or about April 18, 2007, Dunkin' terminated Ahrens' employment for reasons other than for cause.  Ahrens was informed of his termination by his supervisor as well as Dunkin's Brand Operating Officer, Thomas Wyczawski ("Wyczawski"), and Dunkin's Human Resources Director, Frederick Schlecht ("Schlecht").

Ahrens contends that, after he was released to return to work on April 1, 2007, Dunkin' refused to reinstate him to his job and did not assign him any duties or responsibilities prior to his termination on April 18, 2007.  In preparation for their meeting with Ahrens on April 18, 2007, Wyczawski asked Schlecht to prepare a termination letter and final paycheck.  As Human Resources Director, Schlecht was responsible for the administration of any severance payments to be made to

3

employees, including the preparation and receipt of release agreements.  Schlecht is an experienced human resources manager with over twenty years experience, and had participated in the termination of other employees prior to April 18, 2007, including by authorizing severance payments upon receipt of an executed release agreement.  Dunkin's legal department had made available to Schlecht a template release for use in terminations.  However, Schlecht did not prepare a release nor tender one to Ahrens.

During the course of the meeting on April 18, 2007, Ahrens informed both Schlecht and Wyczawski that he believed his termination was illegal and in violation of his rights under the FMLA.  He further stated that he intended to contact an attorney regarding his termination.  During the meeting, Schlecht handed Ahrens a termination letter confirming that Dunkin' would provide him a severance payment of $97,500 in lump sum, twelve months of COBRA medical coverage, and outplacement services not to exceed a cost of $25,000.  Def. Exh. F. Dunkin' had never previously discussed with Ahrens providing COBRA continuation coverage or outplacement services in connection with his termination.  The termination letter did not condition Dunkin's payment of severance or receipt of any benefits upon a signed release and Dunkin' did not discuss with Ahrens the execution or requirement of a release, despite Ahrens assertion of his rights under the FMLA and threat to pursue a FMLA claim.

Following the meeting with Ahrens on April 18, 2007, Schlecht reported Ahrens' remarks regarding his belief that his termination was illegal and that he

4

intended to contact an attorney to his supervisor, Jefferson Slater, Dunkin's Vice President of Human Resources.  Slater nevertheless instructed Schlecht to pay Ahrens his severance without an instruction to first prepare or obtain a release from Ahrens.

On May 17, 2007, followings its termination of Ahrens and without having tendered a release of claims to Ahrens for execution, Dunkin's payroll department electronically transferred Ahrens' severance payment in the amount of $97,500 into Ahrens' bank account.  Pursuant to the terms of the Offer, the severance payment Ahrens received equaled six months of his then-current base compensation.

On or about June 11, 2007, Ahrens' counsel wrote a letter to Dunkin' asserting Ahrens' rights under the FMLA.  In response, on or about June 18, 2007, Dunkin' wrote a letter to Ahrens' counsel and, rather than tender a release or demand the return of the severance, asserted that Ahrens' receipt of the severance constituted the release.  After its receipt of the letter from Ahrens' counsel, Dunkin' made no effort to recover the severance payment made to Ahrens.

Dunkin' contends that it transmitted the severance payment to Ahrens pursuant to the terms of the Offer and did not intend to waive its rights under the Offer to receive a release of claims in exchange for its payment of severance to Ahrens, although it never sought to obtain a release in spite of Ahrens' statements to Schlecht and Wyczawski.  Dunkin's position is that Ahrens' acceptance of his

severance payment constituted a release of claims to Dunkin'.  Ahrens admits that he received the severance payment, that he knew that it was in an amount equal to six months of his then-current base salary, and that he knew that the money deposited was the severance he was owed.  Pl. Loc. R. 56(a)(2) Statement ¶ 19. Ahrens further admits that he kept and used the funds from the severance payment without segregating them into a specially-designated account such as an escrow or disputed funds account.  Id. ¶ 21.

According to Dunkin', Ahrens is aware that no one from Dunkin' ever decided not to require him to execute and return a release, nor was he ever told by anyone at Dunkin' that the company did not intend to accept the release of claims. On the other hand, Ahrens' takes the position that the termination letter constituted a superseding agreement and that Dunkin' waived its right to a release of claims from him by making a unilateral payment of severance.  Ahrens claims that he relied upon the terms of the termination letter in receiving and retaining the severance, and that he did not intend to waive any of his rights, including those under the FMLA and CFEPA, by accepting the severance.

On December 29, 2008, Ahrens filed suit against Dunkin' in Connecticut Superior Court, alleging that he was terminated because of his depression in violation of the CFEPA and FMLA.  On January 30, 2009, Dunkin' removed the case to this Court on the basis of federal question jurisdiction under 28 U.S.C. § 1331 because Ahrens has asserted a claim arising under federal law, and diversity jurisdiction under 28 U.S.C. § 1332 because the parties are citizens of different

6

states and the amount in controversy exceeds the sum of $75,000.  On March 3,

2009, Dunkin' filed its Answer and Counterclaims, in which it asserted four

counterclaims against Ahrens for breach of contract, breach of the implied

covenant of good faith and fair dealing, unjust enrichment, and specific

performance on the basis that Ahrens failed to provide a release of claims upon

his acceptance of his severance payment as required by the Offer.  On June 1,

2010, Dunkin' filed the instant motion for summary judgment as to its

counterclaims only.  [Doc. #29].  Ahrens filed his opposition to the motion on July

6, 2010.  [Doc. #36].  Neither party has moved for summary judgment with respect

to the CFEPA and FMLA claims asserted by Ahrens in his Complaint.

## II.  DISCUSSION

### A.  Standard of Review

Summary judgment is appropriate only when "the pleadings, the discovery

and disclosure materials on file, and any affidavits show that there is no genuine

issue as to any material fact and that the movant is entitled to a judgment as a

matter of law."  Fed. R. Civ. P. 56(c).  "The substantive law governing the case will

identify those facts that are material, and '[o]nly disputes over facts that might

affect the outcome of the suit under the governing law will properly preclude the

entry of summary judgment.'"  Bouboulis v. Transp. Workers Union of Am., 442

F.3d 55, 59 (2d Cir. 2006) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

248 (1986)).

7

The moving party bears the burden of showing that no genuine issues exist as to any material facts.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323-25 (1986).  If the moving party meets its burden, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must - by affidavits or as otherwise provided in this rule - set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e).  "If the party moving for summary judgment demonstrates the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor."  Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp., 302 F.3d 83, 91 (2d Cir. 2002).  "The non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture."  Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir.1990) (internal quotations and citations omitted).  A party also may not rely on conclusory statements or unsupported allegations that the evidence in support of the motion for summary judgment is not credible.  Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993).

The Court "construe[s] the evidence in the light most favorable to the non-moving party and . . . draw[s] all reasonable inferences in its favor."  Huminski v. Corsones, 396 F.3d 53, 69-70 (2d Cir. 2004).  "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving

party, summary judgment must be denied."  **Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH**, 446 F.3d 313, 315 (2d Cir. 2006).

B.  <u>Analysis</u>

 1.  <u>Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing</u>

　　　In support of its motion for summary judgment as to its counterclaims for breach of contract and breach of the covenant of good faith and fair dealing, Dunkin' argues that the Offer constituted a binding and enforceable employment contract upon Ahrens' acceptance of its terms on September 7, 2005.  Dunkin' asserts that Ahrens' failure to deliver a release of claims upon receiving a severance payment as provided in the Offer constituted a violation of his employment contract.

　　　To form a binding and enforceable contract in Connecticut, there must be "an offer and acceptance based on a mutual understanding by the parties" which is manifested by "mutual assent between the parties."  **Steinberg v. Reding**, 24 Conn. App. 212, 214 (1991).  Also, the contract must be definite and certain as to its terms and requirements, and must be supported by valid consideration.  **See L&R Realty v. Connecticut Nat'l Bank**, 53 Conn. App. 524, 534 (1999).  "Consideration consists of a benefit to the party promising, or a loss or detriment to the party to whom the promise is made."  **Harley v. Indian Spring Land Co.**, 123 Conn. App. 800, 819 (2010).  The duty of good faith and fair dealing is implied into a contract or contractual relationship, such that "every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to

9

receive the benefits of the agreement."  De La Concha of Hartford, Inc. v. Aetna Life Ins. Co., 269 Conn. 424, 432 (2004) (internal citations and quotation marks omitted).

Where, as here, an offer of employment lays out specific terms and conditions of employment, and is signed by both parties indicating acceptance of the offer, the terms and conditions become enforceable and the offer letter serves as a binding contract.  See Meany III v. Conn. Hosp. Ass'n, 250 Conn. 500, 516-17 (1999) (holding that a signed offer letter constituted an "express contract" governing salary, benefits, and other conditions of employment, including plaintiff's "at will" employment status).

Ahrens does not dispute that the Offer constituted a binding and enforceable contract.  Instead, Ahrens proffers several reasons why he is not obligated to tender a release of claims in exchange for his severance payment as provided in the Offer.

First, Ahrens contends that the termination letter formed a separate contract which superseded his employment agreement with Dunkin' as memorialized by the Offer.  While parties to a written contract "retain the power to alter or vary or discharge any of its provisions by a subsequent agreement," New England Petroleum Corp. v. Groppo, 214 Conn. 444, 450 (1990), there must be new consideration as well as mutual assent to the meaning and conditions of a modification in order for it to be enforceable.  See Coniglio v. White, 72 Conn. App. 236, 243 n.5 (2002).  In this case, Ahrens has produced no evidence of mutual

10

assent to modify the terms of his employment agreement.  The parties executed the Offer prior to Ahrens commencing his employment, and the terms of the Offer governed his employment while at Dunkin'.  Pursuant to the Offer, Ahrens was to receive a severance payment of six months base compensation upon his termination for reasons other than for cause, conditioned on his return of a full release of claims.  The termination letter served to formally conclude his employment at Dunkin'.  There is no indication that Dunkin' intended to "offer" Ahrens a severance package distinct from that set forth in the Offer by providing him with a termination letter which gave formal notice that his employment was ending and notifying him that he would be receiving a severance payment in accordance with the Offer as well as other items to which he was legally entitled.  Nor is there any evidence that Ahrens provided consideration for the purported superseding agreement.  Although "mutual promises are sufficient consideration to bind parties to a modification," Harris Calorific Sales Co. v. Manifold Systems, Inc., 18 Conn. App. 559, 564 (1989), there is no evidence here that Ahrens made any promise to Dunkin' at the time of his termination in exchange for the benefits he received as set forth in the termination letter.  In fact, he claims the contrary, asserting that Dunkin' unilaterally paid him severance and provided other benefits to him pursuant to the termination letter without requiring anything in exchange.  According to Ahrens, Dunkin' "acted as a mere volunteer," Pl. Opp. at 5; therefore, Ahrens has essentially conceded that the purported superseding agreement or

modification embodied by the termination letter was not supported by valid consideration.

Next, Ahrens argues that Dunkin's conduct of making a unilateral payment of severance without first requiring him to execute a release of claims constituted a waiver of its contractual right to a release of claims.  "Waiver is the intentional relinquishment or abandonment of a known right or privilege." AFSCME, Council 4, Local 704 v. Dept. of Public Health, 272 Conn. 617, 623 (2005).  "Waiver does not have to be express, but may consist of acts or conduct from which waiver may be implied . . . .  In other words, waiver may be inferred from the circumstances if it is reasonable do so."  Id.  An implied waiver may only be found, however, where "the parties were aware of their rights and made the conscious choice, for whatever reason, to waive them."  Mooney v. City of New York, 219 F.3d 123, 131 (2d Cir. 2000).  The party claiming an implied waiver bears the burden of demonstrating "a clear, unequivocal and decisive act of a [waiving] party showing such a purpose."  Lamborn v. Dittmer, 873 F.2d 522, 529 (2d Cir. 1989); see also N.L.R.B. v. New York Telephone Co., 930 F.2d 1009, 1011 (2d Cir. 1991) (the party asserting waiver "bears the weighty burden of establishing that a 'clear and unmistakable' waiver has occurred").

It is undisputed that Dunkin' has never expressly waived its contractual right to a release of claims from Ahrens.  Ahrens argues, however, that a waiver can be implied from the circumstances based upon Dunkin's conduct.  The Court agrees.  The facts presented by Ahrens demonstrate that, in anticipation of a

**12**

meeting with Ahrens on April 18, 2007, Dunkin' prepared a written letter of termination notifying Ahrens that he was being terminated and indicating that he would receive a severance of $97,500, as well as Cobra continuation coverage and outplacement services.  There was no reference in the letter to a release of claims as contemplated in the Offer.  In fact, Dunkin' never even prepared let alone tendered to Ahrens a release agreement for his consideration even though it had a standard form for use in such circumstances and despite the participation of Schlecht, an experienced human resources manager who had previously authorized severance payments to terminated employees only upon receipt of an executed release agreement, in Ahrens' termination.  Further, during the course of the meeting on April 18, 2007, Ahrens informed Dunkin's representatives that he believed his termination was illegal and in violation of his rights under the FMLA, and that he intended to contact an attorney regarding his termination. Nevertheless, Dunkin's Vice President of Human Resources authorized payment of the severance to Ahrens without an instruction to first prepare or obtain a release from Ahrens.  Thereafter, on May 17, 2007, Dunkin's payroll department electronically transferred a severance payment in the amount of $97,500 into Ahrens' bank account.  Based upon the foregoing evidence, there are genuine issues of material fact with respect to whether Dunkin' impliedly waived its right to a release of claims under the circumstances.  See, e.g., Esposito v. DiGenarro, 120 Conn. App. 627, 630-31 (2010) (defendants' conduct constituted a waiver of their right pursuant to a stipulated judgment to perform an audit of a business they

**13**

jointly owned with plaintiff for the purpose of determining if there was surplus cash to which they were entitled).

Moreover, Dunkin' has failed to meet its burden of establishing that Ahrens released his rights under the FMLA and CFEPA. In determining whether a release of discrimination claims is valid, a court must evaluate whether it was entered into "knowingly, willfully and free from coercion." <u>Bormann v. AT&T Communications, Inc.</u>, 875 F.2d 399, 402-03 (2d Cir. 1989). The Second Circuit has adopted a "totality of the circumstances" test for evaluating the validity of a release in the employment context. <u>Id.</u> The Second Circuit enumerated the following non-exhaustive list of factors to be considered pursuant to that test:

> (1) the plaintiff's education and business experience, (2) the amount of time the plaintiff had possession of or access to the agreement before signing it, (3) the role of plaintiff in deciding the terms of the agreement, (4) the clarity of the agreement, (5) whether the plaintiff was represented by or consulted with an attorney, (6) whether the consideration given in exchange for the waiver exceeds benefits to which the employee was already entitled by contract or law, [and (7)] whether an employer encourages or discourages an employee to consult an attorney, . . . and whether the employee had a fair opportunity to do so.

<u>Id.</u> at 403. As these factors make clear, the totality of the circumstances test presupposes the existence of a release, the terms and clarity of which are subject to review by the Court. Here, however, Ahrens never actually executed a release of claims nor did Dunkin' even tender a release of claims for his consideration, and therefore there is no release which he could have entered into knowingly or willfully. The Offer itself clearly did not contain a release of claims because the language of the Offer merely provided that Ahrens would receive a severance

14

"conditioned on the return of a full release of claims," without specifying any terms of the contemplated release.  Haney Aff., Exh. B.

Further, even assuming that the aforementioned provision of the Offer could constitute a release of claims, it would be invalid because it would amount to a prospective waiver of rights, which is specifically prohibited by regulation promulgated pursuant to the FMLA.  See 29 C.F.R. § 825.220(d).  Section 825.220(d) states, in pertinent part:

> Employees cannot waive, nor may employers induce employees to waive, their prospective rights under the FMLA . . . .  This does not prevent the settlement or release of FMLA claims by employees based on past employer conduct without the approval of the Department of Labor or a court.

Id.  At the time that Ahrens executed the Offer, he had not yet commenced working for Dunkin'.  Therefore, under Section 825.220(d), he could not have validly waived future FMLA claims arising from his employment with Dunkin' in exchange for a severance payment.  Although Section 825.220(d) does not prohibit the release of FMLA claims based upon past employer conduct as part of a severance agreement, as discussed above, Ahrens never executed nor did Dunkin' even tender him a release of claims.  Instead, the evidence indicates that Dunkin' unilaterally paid Ahrens his severance despite having previously been notified that he believed his termination to be in violation of the FMLA and that he intended to contact an attorney.  Therefore, Dunkin has not demonstrated that Ahrens' waived his FMLA rights.

Finally, Dunkin' contends that Ahrens' retention of the severance payment constitutes a ratification of the release of claims contemplated by the terms of the Offer.  "As a general rule, ratification is defined as the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account . . . .  Ratification requires acceptance of the results of the act with an intent to ratify, and will full knowledge of all the material circumstances[.]"  Il Giardino, LLC v. Belle Haven Land Co., 254 Conn. 502, 530 (2000) (citation omitted).  "[P]arties may become bound by the terms of a contract, even though they do not sign it, where their assent is otherwise indicated, such as by accepting and acting on the contract or by ratifying the contract, or by the acceptance by one of the performance of the other."  Schwarzschild v. Martin, 191 Conn. 316, 321-22 (1983) (citation omitted).

Dunkin' argues that Ahrens' acceptance and retention of the severance payment constituted the implied delivery of a release and bound him to the terms of the release.  However, the cases cited by Dunkin' in support of this proposition are inapposite because they involve circumstances in which a contract between two parties was executed and subsequently repudiated after performance by one party.  See, e.g., Young v. Data Switch Corp., 231 Conn. 95, 112-13 (1994) (holding that plaintiff had ratified a severance agreement he initially executed and accepted payments under but subsequently and belatedly attempted to rescind on the grounds of duress); O'Shea v. Commercial Credit Corp., 930 F.2d 358, 363-63 (4th Cir. 1991) (holding that, even if release executed by plaintiff was invalid because of

16

duress, defendant would prevail on the basis that plaintiff's subsequent acceptance of severance pay under the agreement demonstrated an intent to ratify the agreement).  Here, by contrast, Ahrens' never actually executed a release. Instead, during the April 18, 2007 meeting, Ahrens' expressed his intent to enforce his rights under the FMLA and to seek legal counsel for that purpose. Nevertheless, Dunkin' transmitted a severance payment of $97,500 to Ahrens without either obtaining a release from Ahrens or even tendering a release to Ahrens for his consideration.  In such circumstances, Dunkin' cannot show as a matter of law that Ahrens ratified a release of his discrimination claims by accepting and retaining the severance payment.  See, e.g., Van Heest v. McNeilab, Inc., 624 F. Supp. 891, 895 (D. Del. 1985) (rejecting defendant's argument that plaintiff's acceptance of payment for the balance of her employment contract constituted ratification of a release of claims sent to her after she had received payment because she had never seen the written release at the time she accepted the money and the only discussion of a release was in vague and general terms); see also Tung v. Texaco, 150 F.3d 206, 208 (2d Cir. 1998) (finding that plaintiff's retention of severance benefits did not constitute ratification of a written release agreement waiving his ADEA claims that did not comply with statutory requirements because "the employer cannot invoke the employee's failure to tender back as a way of excusing its own failure to comply" with statutory requirements).  Further, as Ahrens readily acknowledges, to the extent that Dunkin' seeks to apply ratification in order to bar a double recovery, the jury may

simply be instructed that any severance received by him is to be set off against his claims for damages under the FMLA and CFEPA.  See Pl. Opp. at 23-24 (citing Furman v. Gulf Ins. Co. of Dallas, 152 F.2d 891, 895 (8th Cir. 1946)); see also Tung, 150 F.3d at 209 (employer which has paid consideration for an invalid release and is then sued may have "claims for restitution, recoupment, or setoff against the employee").

## 2.  Unjust Enrichment

Dunkin' also seeks summary judgment on its counterclaim for unjust enrichment.  The doctrine of unjust enrichment is "based upon the principle that one should not be permitted unjustly to enrich himself at the expense of another but should be required to make restitution of or for property received, retained or appropriated."  Town of New Hartford v. Connecticut Resources Recovery Authority, 291 Conn. 433, 452 (2009).  In order to establish a claim for unjust enrichment, a plaintiff must demonstrate that the defendant received a benefit to which he was not entitled to the detriment of the plaintiff.  Id.  Dunkin' has not met its burden of establishing that Ahrens received a benefit to which he was not entitled because, as discussed *supra*, there is substantial evidence that Dunkin' impliedly waived its right to a release of claims from Ahrens.  Further, Dunkin' has failed to prove that Ahrens knowingly and willfully agreed to a release of his discrimination claims.  See Billy & Leo, LLC v. Blacher, No. CV040072177, 2005 WL 2857631, at *2 (Conn. Super. Ct. Oct. 6, 2005) ("Generally relief under the equitable

theory of unjust enrichment is confined to [a] circumstance [in which] there is an agreement between the parties.").

### 3.  Specific Performance

Finally, Dunkin' is not entitled to specific performance because it has failed to establish the elements of its counterclaims for breach of contract, breach of the covenant of good faith and fair dealing, and unjust enrichment.  See Cutter Development Corp. v. Peluso, 212 Conn. 107, 114-15 (1989) ("It is settled law . . . that in an action for specific performance the plaintiff has the burden of proving all of the essential elements of his cause of action and the burden is primarily on him to show his right in equity and good conscience to the relief sought.").

### III.  CONCLUSION

Based upon the above reasoning, Dunkin's motion for summary judgment on its counterclaims for breach of contract, breach of the covenant of good faith and fair dealing, unjust enrichment, and specific performance [Doc. #29] is DENIED.  This case will proceed to trial as set forth in the Court's Scheduling Order dated February 24, 2010.  [Doc. #28].

IT IS SO ORDERED.

_____/s/_____
Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut:  January 4, 2011.

19